## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **CHRISOPHER KOYM** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | Cause No.   **1:23-cv-00392** |
| | § | |
| **CITY OF COLLEGE STATION,** | § | **COMPLAINT FOR DECLARATORY** |
| **BRAZOS COUNTY, DISTRICT** | § | **RELIEF, VIOLATION OF CIVIL** |
| **ATTORNEY JARVIS PARSONS,** | § | **RIGHTS, AND DAMAGES** |
| **CHIEF OF POLICE BILLY COUCH,** | § | |
| **FORMER CHIEF OF POLICE SCOTT** | § | |
| **McCOLLUM, ASST. CHIEF BRANDY** | § | |
| **NORRIS, STATE OF TEXAS, all** | § | |
| **individuals being sued in their official** | § | **DEMAND FOR JURY TRIAL** |
| **capacities** | § | |
| | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT, VIOLATION OF CIVIL RIGHTS AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Christopher Koym, (hereinafter "Plaintiff" or "Mr. Koym"), by and through his undersigned attorney, complaining of Defendants, and respectfully alleges as follows:

### NATURE OF COMPLAINT

1.     This is a civil rights action in which the Plaintiff seeks relief for the violation of his rights secured by the Declaratory Judgment Act (28 U.S.C. § 2201), the Civil Rights Act (42 U.S.C. § 1983), and the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1391. This Court also has supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367.

3.      The events that gave rise to this lawsuit took place in College Station, Brazos County, Texas.

4.      Venue is appropriate in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(1) and (2), because most or all of the Defendants reside and may be found in the Western District of Texas and all, or a substantial part, of the events giving rise to these claims occurred in the Western District of Texas.

## PARTIES

5.      Plaintiff, Christopher Koym, is a citizen of College Station, Texas, and a former College Station Police Department Officer. Mr. Koym has been, at all times relevant to this action, a citizen and a resident of Texas and a state certified peace officer.

6.      Defendants are all, upon information and belief, the State of Texas and governmental subdivisions of the State or individual members of law enforcement or prosecutorial agencies in an appointed or elected capacity.

7.      Defendant City of College Station operates the College Station Police Department, a law enforcement agency, and is a municipality capable of being sued under Texas law. The City of College Station ("City") is the legal entity responsible for the College Station Police Department ("CSPD"). Plaintiff bases all applicable and appropriate claims as to the Defendants City and the CSPD on the doctrine of municipal liability pursuant to *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978).

8.      Defendant Brazos County, Texas, has employees within the Brazos County District Attorney's Office and operates by agreement with the special district a prosecutorial agency and is a governmental entity capable of being sued under Texas law. Brazos County ("County") is the legal entity responsible for the Brazo's County District Attorney's Office ("DA's Office"). The Plaintiff bases all applicable and appropriate claims as to the Defendants County and the DA's Office on the doctrines of municipal liability pursuant to *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978).

9.      Defendant Jarvis Parsons ("DA Parsons"), was at all times relevant, the District Attorney for the DA's Office. He is an elected official of the State of Texas. In that capacity, DA Parsons served in a supervisory and policymaking role with the DA's Office. Upon information and belief, DA Parsons has been, at all times relevant to this action, a citizen and resident of Texas.

10.     Defendant Billy Couch ("Chief Couch"), was at all times relevant, an Assistant Chief of Police with the College Station Police Department. In that capacity, Assistant Chief Couch served in a supervisory and policymaking role with CSPD. Assistant Chief Couch is now the Chief of Police for the CSPD. Upon information and belief, Chief Couch has been, at all times relevant to this action, a citizen and resident of Texas.

11.     Defendant Scott McCollum ("Chief McCollum"), was at all times relevant, the Chief of Police of the CSPD. In that capacity, Chief Couch previously served in a supervisory and policymaking role within the CSPD. Upon information and belief, Chief McCollum has been, at all times relevant to this action, a citizen and resident of Texas.

12.     Defendant Brandy Norris ("Asst. Chief Norris") was employed by the CSPD as Assistant Chief of Police with the City and was acting under the color of law at all times relevant

to this action. Upon information and belief, Asst. Chief Norris has been, at all times relevant to this action, a citizen and resident of Texas.

13.     Defendant State of Texas is responsible for the actions of officials with regard to state-wide enforcement of its law and regulations.

14.     In committing the acts and omissions herein described, Defendants have, separately or in concert, been and are acting under the color of law, the statutes, ordinances, regulations, customs, policies of the State of Texas, Brazos County, or the City of College Station.

## STATEMENT OF FACTS

15.     Plaintiff resides in College Station, Texas, and was a police officer with the College Station Police Department ("CSPD") from June 16, 2016, until August 27, 2019. Plaintiff was an employee of the CSPD at the time of the events that are the basis for this lawsuit and was, after his employment was terminated, subjected to unlawful and violative acts by the Defendants as alleged herein.

16.     On June 4, 2019, Plaintiff was off duty, wearing shorts and a t-shirt near the CSPD parking lot at approximately 7:30 a.m., and talking to CSPD Officer Damien Anderson ("Officer Anderson"). While Plaintiff was talking to Officer Anderson, a Dodge truck driven by a City Fleet Services employee, Cole Wise ("Mr. Wise"), drove into the parking lot and right by Plaintiff at a speed in excess of the 30 miles per hour speed limit. Plaintiff waived at the driver with his arms as a means to signal to Mr. Wise that he should slow down. In response, Mr. Wise put the truck in neutral and loudly gunned the truck's engine as he drove by Plaintiff and Officer Anderson. After Mr. Wise parked the Dodge truck, Plaintiff turned back to his conversation with Officer Anderson. Mr. Wise had a history of driving through this parking lot at high speeds and nearly causing several accidents.

17.     During this exchange, CSPD Lt. Sean Beatty ("Lt. Beatty") and Officer William Snell ("Officer Snell") were standing on the sidewalk by the CSPD building involved in their own conversation. Officer Snell was standing next to his unmarked police vehicle, but on duty, while he was talking to Lt. Beatty. Officer Snell saw Mr. Wise speed by and heard him gun the Dodge truck's engine. Officer Snell immediately got into his vehicle and drove 300 meters to the fleet services building to speak to Mr. Wise about his speeding and gunning his truck's engine. Officer Snell had to go to the City's Public Works building to catch up with Mr. Wise since Mr. Wise drove to that building's parking lot. Moments later, CSPD Officer Robbie Turner ("Officer Turner") drove up to Plaintiff in a marked police vehicle and asked if Plaintiff would show him how to log onto one of the marked police vehicle's law enforcement programs. Plaintiff showed Officer Turner how to log onto the program and then asked Officer Turner if we would go assist Officer Snell with Mr. Wise. Plaintiff did so because Officer Turner was wearing a bodycam capable of recording any discussions between Officer Snell and Mr. Wise. Officer Turner's bodycam was on and recording Plaintiff's statements to Officer Turner and also recorded Officer Snell's interactions with Mr. Wise.

18.     Officer Turner then drove off and caught up to Officer Snell at the City's Public Works building and both officers looked for Mr. Wise inside the building. When they found Mr. Wise, they informed him that he had been speeding through the parking lot and that gunning his engine caused a noise disturbance. During this conversation, Mr. Wise became verbally combative and argumentative with the officers and Officer Snell issued a Disorderly Conduct -- Noise citation to Mr. Wise. At no point during this encounter did Plaintiff approach or speak to either Officer Snell or Mr. Wise.

19.     About a month later, on Friday July 5, 2019, Plaintiff was at work when he received an email from CSPD Lt. Thomas Brown ("Lt. Brown") informing Plaintiff that he, Officer Turner, and Officer Anderson were witnesses in an CSPD Internal Affairs ("IA") investigation. The email did not provide any other details of the IA investigation. When Plaintiff returned to work later the same day, he spoke to Lt. Beatty, who informed Plaintiff that the IA investigation involved the June 4th incident between Officer Snell and Mr. Wise. Lt. Beatty also informed Plaintiff that only Officer Snell was a target of the investigation and that the investigation was based on an allegation of discourteous conduct directed at Mr. Wise.

20.     On August 9, 2019, Plaintiff was interviewed by Lt. Brown at CSPD's offices about his involvement in the June 4th incident between Officer Snell and Mr. Wise. Lt. Brown told Plaintiff that the target of the IA investigation was Officer Snell, that Plaintiff was only a witness to these events, and not a subject of the IA investigation. Lt. Brown provided Plaintiff a Garrity warning and directly told Plaintiff that failure to answer his questions would be grounds for discipline up to and including termination. In an abundance of caution, Plaintiff stated that he had obtained the services of a Texas Municipal Police Association attorney and that he wanted his attorney's assistance before making an official statement. Lt. Brown replied that Plaintiff did not have the right to have an attorney present and that Plaintiff could not refuse to answer his questions at that time. Plaintiff complied because he did not want to be subjected to discipline.

21.     During the course of this 12-minute recorded interview, Lt. Brown asked Plaintiff about his role in the June 4th incident involving Mr. Wise. It very quickly became apparent to Plaintiff that, despite Lt. Brown's statements to the contrary, he was—for some unknown reason— also a target of this IA investigation and subject to discipline. Lt. Brown's questions centered on two issues: 1) whether Plaintiff directed, as opposed to asking, Officer Turner to go assist Officer

Snell, and 2) whether Plaintiff made a statement to Officer Turner directing him to issue tickets to Mr. Wise. When addressing the issuance of a citation to Mr. Wise, Lt. Brown directly asked Plaintiff "What would you say if I told you that you had said something, and don't quote me on it, about go down there and stroke[1] him some tickets?" Plaintiff denied making this statement. Lt. Brown never informed Plaintiff that there was a recording of Plaintiff's statements to Officer Turner or that Lt. Brown had obviously reviewed this recording prior to this IA interview.

22.     On the basis of Plaintiff's answers at this IA interview, Lt. Brown filed a formal IA complaint against Plaintiff on the same day as the interview. The complaint alleged one cause for discipline stating that Plaintiff was "untruthful during an internal investigation interview in which you were a witness." Lt. Brown specifically alleged that he had asked Plaintiff about his interaction with Officer Turner and whether Plaintiff asked Officer Turner to issue "Cole some tickets" and that Plaintiff responded that "absolutely not, I will deny that to the grave." On the basis of this alleged dishonesty, Plaintiff was placed on Paid Administrative Leave and had his badge, CSPD ID card, CSPD access card, and service weapon confiscated.

23.     On August 23, 2019, Lt. Brown completed his IA investigation of Plaintiff, which now contained three allegations, as opposed to the lone original allegation, of misconduct against Plaintiff. All three allegations were sustained by CSPD command staff with the exception of one CSPD supervisor. The only person who did not uphold all three allegations of misconduct was CSPD Sergeant William Matush ("Sgt. Matush"). Although Sgt. Matush reviewed the documents related to the IA investigation, he was denied access to the audio recording of the two incidents that were basis of the IA investigation. These were the same audio recording that Lt. Brown reviewed prior to his August 9th interview of Plaintiff. Despite not reviewing these audio

---

[1] In this context, "stroking tickets" is a slang term for issuing a ticket or citation.

recordings, Sgt. Matush determined that the original allegation made by Lt. Brown was unfounded, but ultimately made the recommendation to terminate Plaintiff for being "untruthful during at least two [of the new allegations] of an Internal Affairs investigation." These new allegations were that Plaintiff was "untruthful when he responded to questions related to an internal-affairs investigations." The two specific, remaining allegations against Plaintiff were that:

> 1.      Koym said he didn't have anything to do with Snell making contact with Wise. Snell specifically cited Koym as one of the reasons he made contact with Wise.
>
> 2.      Koym said he asked Turner to go down to Public Works and back up Snell since Turner was wearing a uniform, driving a marked patrol vehicle and wearing a BWC. Koym didn't say any of these things to Turner as evidenced by the BWC.

Members of CSPD's supervisory staff reviewed Lt. Brown's two remaining allegations and sustained them after allegedly having reviewed the evidence appended to the IA investigation. These findings are not only false, they were demonstrably false at the time of the IA investigation. The falsity of the two remaining allegations can easily be verified based on the very audio evidence that was referenced in the IA investigation, but denied to Sgt. Matush.

24.      As part of the IA investigation, Lt. Brown interviewed Officer Snell regarding the ticket he issued to Mr. Wise on July 12, 2019. The recording of this interview was part of the evidence reviewed by all CSPD supervisors and officers involved in this IA investigation, except Plaintiff. During this recorded interview, Officer Snell said that he alone made the decision to follow Mr. Wise and issue a ticket. Officer Snell also said that he made the decision to go talk to Mr. Wise before he ever saw Plaintiff that morning. At no point during this hour-long interview did Officer Snell say that Plaintiff caused him to make "contact with Wise."

25.      Plaintiff's June 4th statement to Officer Turner, as recorded by Officer Turner's bodycam footage, was "Will you do me a favor? Will you please go down with William Snell and

go to that gentleman that drove that big ass red and black Dodge that was hauling ass through here and tell him that if doesn't stop doing that s*** we're going to start stroking him tickets." Lt. Brown then asked Plaintiff, 67 days later, during the August 9th Internal Affairs interview, what his statements were to Officer Turner on June 4th. Plaintiff's exact words to Lt. Brown during the August 9th IA interview were: "I believe I told him, I said 'Hey Snell' I'm sorry 'Hey Robbie, I think Snell went down there. He's talking to one of the fleet guys, ah he's in a polo, you know he's not in uniform, you are. Would you mind going down there, you're in a Tahoe with a body cam and in uniform?'" On the basis of the difference between what Plaintiff's actual statement on June 4th and his statement on August 9th about what he remembered saying, Lt. Brown concluded that Plaintiff was "untruthful in [his] response related to an internal investigation."

26.     A basic flaw in Lt. Brown's questioning of Plaintiff on August 9th led to an inaccurate and incorrect characterization of Plaintiff's responses in the IA investigation. Lt. Brown asked Plaintiff whether he told Officer Snell to "go down there and stroke [Mr. Wise] some tickets." Plaintiff, in fact, said, "…tell him that if doesn't stop doing that s*** we're going to start stroking him tickets." The statement attributed to Plaintiff by Lt. Brown would have been a directive from Plaintiff to Officer Snell to issue Mr. Wise a ticket, if he had made it. In reality, Plaintiff made a conditional statement when he asked Officer Snell to warn Mr. Wise that continued traffic or municipal violations would result in Mr. Wise having tickets issued to him. Plaintiff answered Lt. Brown's questions accurately and honestly. Lt. Brown erroneously concluded in his report that the statement made by Plaintiff was directive. It was not. It was conditional. CSPD's supervisory staff then rubberstamped Lt. Brown's IA investigation without actually reviewing the evidence or, if they did, they reviewed it in a cursory manner. If any of CSPD's supervisory staff had actually reviewed the IA investigation evidence with the diligence

that such an investigation deserves, they should have arrived at a different conclusion. They did

not and two of the three false allegations in the IA investigation against Plaintiff were sustained.

27.     In addition to the many deficient aspects of Lt. Brown's IA investigation, Plaintiff

never knew and was never told by CSPD that Officer Turner's bodycam footage existed, much

less that Lt. Brown had reviewed the video prior to his August 9th IA interview. Plaintiff didn't

learn of the recording's existence until he saw it listed as evidence in the final IA report issued on

August 23, 2019. Despite this clearly flawed, deficient, and unfair IA investigation, Plaintiff was

found to be "untrustworthy."

28.     Based on the two allegations of "untruthful" conduct that were sustained, CSPD

supervisors made the decision to terminate Plaintiff. Several individuals in supervisory positions

made the recommendation to terminate Plaintiff. The specific violation Plaintiff was alleged to

have violated is City's Standards of Conduct related to Truthfulness, which states that an employee

"shall not knowingly falsify any report, document, or statement" and "shall be truthful in any

official verbal … communication… or internal investigation."[2] The individuals who voted to

sustain the two allegations and recommended termination, based on their review of the IA

investigation and supporting evidence, were Sgt. Matush, Lt. Brown, Lt. Beatty, and Asst. Chief

Norris. The decision to terminate Plaintiff was made by these CSPD employees under the color of

law and their respective positions within the City as subordinate policymakers to that of the Chief

of Police.

29.     After his subordinates' review of the IA investigation and their recommendation to

terminate Plaintiff, Chief McCollum ratified his subordinates' decision to terminate Plaintiff in his

---

[2] CITY OF COLLEGE STATION, TEX., CITY POLICY NO. 2.01, CODE OF ETHICS; City of College Station, Tex., Police
Department, Ch. 09 Standards of Conduct, § 15 Truthfulness.

role as the ultimate policymaker for the CSPD. Plaintiff resigned on August 27, 2019, before he was terminated.

30.     The fact that these CSPD supervisors sustained such a clearly unfounded disciplinary allegation and recommended termination is a clear example of the City's failure to train its police force. None of these supervisors apparently reviewed the evidence that was basis for Plaintiff's discipline or, if they did, they ignored it. These failures include withholding the exculpatory audio recordings from Sgt. Matush, the only CSPD supervisor who judged Lt. Brown's initial IA allegation against Plaintiff to be unfounded. The fact that the City, through the decisions of Chief McCollum and Chief Couch, still keeps Plaintiff on its Brady List despite such a procedurally and substantively inadequate investigation exhibits the municipality's deliberate indifference to adopting or implementing a minimally adequate training policy.

31.     It is the City's inadequate training that directly led to the Constitutional violation perpetrated against Plaintiff.[3] An adequate training policy would have, at a minimum, required the individuals who reviewed the IA investigation to review the direct evidence of the alleged misconduct, explain how their finding of "untruthful" conduct was supported by that evidence, and how this finding required placing Plaintiff on a Brady List. Even this low bar was not met. While the sheer inadequacy and utter lack of professionalism in CSPD's IA "investigation" of Plaintiff was readily apparent at this juncture, it pales in comparison to the CSPD's and the Brazo's County District Attorney's Office conduct after Plaintiff resigned.

32.     Plaintiff resigned from CSPD on August 29, 2019, and CSPD then took two separate, but related actions. First, CSPD reported Plaintiffs effective termination to the Texas Commission on Law Enforcement ("TCOLE") in a Separation of Licensee Form F-5 ("F-5") on

---

[3] *See Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).

September 4, 2019. The second action was to place Plaintiff on their Brady List without ever notifying him or providing him with an opportunity to contest his placement on this list. The bases for the dishonorable designation in Plaintiff's F-5 report and his placement on the CSPD's and the DA's Office's Brady List stemmed from the two sustained instances of untruthfulness related to Lt. Brown's IA investigation.

33.     The F-5 report was made to TCOLE pursuant to the Texas Occupations Code, which requires "[t]he head of a law enforcement agency or the head's designee [to] submit a report to the commission on a form prescribed by the commission regarding a person licensed under this chapter who resigns … is terminated, or who separates from the law enforcement agency for any other reason."[4] The F-5 listed the character of Plaintiff's discharge as "dishonorable" due to "untruthfulness." This determination, as noted on the F-5 form, can be appealed. Many TCOLE licensees who are reported as a "dishonorable discharge" appeal this designation because it effectively limits their ability to continue working as Texas peace officers. Few agencies will hire an officer who received a dishonorable discharge from their prior law enforcement agency.

34.     Plaintiff filed an appeal with TCOLE and CSPD on September 10, 2019, challenging CSPD's dishonorable designation in his F-5. TCOLE referred the appeal to the Texas State Office of Administrative Hearings on October 8, 2019, for a hearing on the appeal. On November 14, 2019, Administrative Law Judge Joanne Summerhays ("ALJ Summerhays") issued an order advising Plaintiff and CSPD of the date, time, and place for the hearing. On December 10, 2019, the date noticed for the hearing, Plaintiff was present, but CSPD failed to appear and defaulted. On December 18, 2019, ALJ Summerhays issued an order changing Plaintiff's F-5 designation to reflect that he was "Honorably Discharged" because "[t]he preponderance of the

---

[4] TEX. OCC. CODE § 1701.452(a).

evidence does not prove Mr. Koym's separation was properly designated as a dishonorable discharge under Texas Occupations Code § 1701.452(b)."[5]

35.     The second action CSPD and the Brazos County District Attorney's Office took against Plaintiff was to place him on their Brady List and never made an effort to notify Plaintiff of this action. A Brady List is a compilation of individuals kept by criminal district attorneys and police departments that contains the names of law enforcement officers who have had incidents of untruthfulness, criminal convictions, candor issues, or some other type of issue placing their credibility into question. A Brady List is named after the United States Supreme Court's landmark case, *Brady v. Maryland*, that established a criminal prosecutor's duty to turn over all exculpatory evidence to the defense.[6]

36.     While the practice of placing law enforcement officers on a Brady List occurs in every jurisdiction in the United States, there are, quite literally, no discernible standards or laws, on a state or national level, that guide why and how law enforcement officers should be placed on a Brady List and there are certainly no objective standards for how an officer can contest their placement on a Brady List.[7] This absence has led to the deprivation of Plaintiff's right to due process.

37.     CSPD and the DA's Office placed Plaintiff on their Brady List without any discernible or objective standard for doing so. Upon Plaintiff's information and belief, neither CSPD or the DA's Office have any written policies addressing an officer's placement on their Brady List or any procedures that can reasonably be called objective standards for determining

---

[5] Tex. State Office of Admin. Hr'g, Docket No. 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.F5 (Tex. Comm. Law Enforcement Dec. 18, 2019) (final decision and order granting appeal).
[6] *Brady v. Maryland*, 373 U.S. 83 (1963).
[7] *See* Jonathan Abel, Brady's Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team, 67 Stan. L Rev. 743 (discussing the lack of regulation or uniformity in Brady listing police officers).

what offenses, or instances of dishonesty, are considered sufficient to place an officer on a Brady List. The only discernible pattern present in the CSPD's and DA's Office's decisions to place Plaintiff on their Brady List is that the process is completely ad hoc, secretive, and without recourse.

38.     After ALJ Summerhays issued her December 18, 2019, order exonerating Plaintiff of the misconduct CSPD alleged made him "untruthful," Plaintiff spent over two years applying for jobs with law enforcement agencies in central Texas. Plaintiff was not hired by any law enforcement agency and was never told why. On March 25, 2022, Plaintiff applied for an open police officer position with the Hempstead, Texas Police Department ("Hempstead PD"). As part of the application process, the Hempstead PD Chief of Police David Hartley ("Chief Hartley") had Assistant Chief of Police Patrick Christian ("Asst. Chief Christian") conducted a background check on Plaintiff as required by TCOLE's governing laws and regulations and to determine whether Plaintiff was a suitable candidate for employment with the Hempstead PD. Asst. Chief Christian ran a check of Plaintiff's background with CSPD. During this process, Asst. Chief Christian was informed by CSPD that Plaintiff was on the CSPD's and the DA's Office's Brady List, but was not provided with any other information.

39.     Asst. Chief Christian then made a request to CSPD asking for an electronic copy of Plaintiff's disciplinary records by email, but his request for these records was denied in violation of Texas law.[8] He was informed that he would have to view these records in person and without making a copy. Asst. Chief Christian then drove to the College Station to view Plaintiff's CSPD disciplinary records. When Asst. Chief Christian was permitted to see the records, it was in the presence of and under the watch of a City Staff Assistant. Asst. Chief Christian viewed the

---

[8] TEX. OCC. CODE § 1701.451(b) (requiring a law enforcement agency to produce personnel records upon the request of TCOLE or any law enforcement agency who seeks to hire a prospective law enforcement officer).

disciplinary file, took notes, and submitted his findings to Chief Hartley in a formal letter. Among the findings he made were that on May 3, 2022—the date he physically saw these records—Plaintiff was listed as having a "General Discharge" and that the F-5 in the file listed Plaintiff's termination from CSPD as a "Dishonorably Discharged." Nowhere in the file was there a mention of or a listing of Plaintiff as being on a Brady List.

40.     Apart from failing to note that Plaintiff was on CSPD's Brady List, Plaintiff's disciplinary file was notable because it directly violated ALJ Summerhays' order to CSPD and for an egregious violation of Texas state law. First, ALJ Summerhays' order clearly directed that the "F-5 Report of Licensee submitted to TCOLE [by CSPD] for M. Koym shall be changed to reflect that he was Honorably Discharged.'"[9] This had not been done more than two years after ALJ Summerhays issued her order exonerating Plaintiff. Every law enforcement agency that Plaintiff applied to would have been shown this incorrect F-5 by CSPD. CSPD's failure to change Plaintiff's F-5 to an honorable discharge after it was ordered to do so is also a violation of the Disciplinary Procedures related to challenging an F-5 designation.[10]

41.     Second, the designation listed in Plaintiff's records for a "General Discharge" is not supported by any legal or factual finding. This designation is completely fabricated. Plaintiff and CSPD never agreed to have his termination deemed a "General Discharge" nor was it a finding made by ALJ Summerhays. This designation was, in fact, never a finding made by either CSPD or by ALJ Summerhays, the only entity and individual entitled to make such a finding. A "General Discharge" is a significantly detrimental designation because it means that Plaintiff was either "terminated by a law enforcement agency or retired or resigned in lieu of termination by the agency

---

[9] Tex. State Office of Admin. Hr'g, Docket No. 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.F5 at p. 6 (Tex. Comm. Law Enforcement Dec. 18, 2019) (final decision and order granting appeal).
[10] TEX. OCC. CODE § 1701.507(a) (imposing administrative fines on law enforcement agencies or governmental entities that violate any requirements of Chapter 1701 of the Texas Occupations Code).

in relation to allegations of criminal misconduct" or "was terminated by a law enforcement agency or retired or resigned in lieu of termination by the agency for insubordination or untruthfulness."[11]

42.     The head of the relevant law enforcement agency, here current CSPD Chief Billy Couch or former Chief Scott McCollum, has the duty to provide an updated and correct F-5 report when an officer "exhausts all administrative appeals available to the license holder"[12] as Plaintiff did here. Plaintiff's F-5 was not updated in his disciplinary file and appears to have been unlawfully tampered with despite the fact such a record "is an official government document."[13]

43.     The fact that Plaintiff's F-5 was not updated by CSPD to an Honorable Discharge is also evidence of, at best, a deliberate indifference to the implementation of procedures necessary to comply with state law. At worst, the failure to update the F-5 is attributable to malicious intent by CSPD policymakers. Either way, the failure to update Plaintiff's F-5 was a deliberate action, as evidenced by the fact that Plaintiff's termination was listed as a "General Discharge" when Asst. Chief Christian saw it in May of 2022. This is because CSPD never alleged Plaintiff engaged in conduct that would subject him to a General Discharge nor was it the finding made by ALJ Summerhays.

44.     The General Discharge designation Asst. Chief Christian saw in Plaintiff's CSPD file in 2022 also indicates that Plaintiff's F-5 was possibly falsified. Plaintiff first challenged CSPD's Dishonorable Discharge designation in Plaintiff's F-5 in September of 2019. The discharge was upgraded to honorable when he was exonerated by ALJ Summerhays in December of 2019. The fact that Asst. Chief Christian saw that Plaintiff's disciplinary records listed his termination as a General Discharge in 2022 shows that these records were changed without legal

---

[11] TEX. OCC. CODE § 1701.452(b)(2)(A), (B).

[12] *Id.* at (d)(2).

[13] *Id.* at (g).

authority and in violation of ALJ Summerhays' order. The improper designation of Plaintiff's termination in his disciplinary records is also proof that the tampering was a CSPD official policy or custom because only a policymaker can make the decision to change the characterization an individual officer's discharge in an F-5.[14]

45.     On May 17, 2022, Chief Hartley called Brazos County District Attorney Jarvis Parsons and spoke to DA Parson's about Plaintiff's listing on the DA's Office Brady List. DA Parsons told Chief Hartley that he would not be removing Plaintiff from the DA's Office Brady List despite Plaintiff's exoneration of the underlying conduct. Plaintiff was originally placed on CSPD's Brady List at the direction of former Chief McCollum and has remained there at the direction of Chief Couch. The fact that Plaintiff has been kept on this Brady List is a present and ongoing deprivation of Plaintiff's procedural and substantive due process rights under the 14th Amendment to the United States' Constitution and thus a "deprivation of a federally protected right caused by action taken pursuant to an official municipal policy."[15]

46.     This deprivation has been ongoing since Plaintiff was placed on the Brady List in 2019 and continues as of the date of the filing of this petition. This deprivation is ongoing despite the fact that Plaintiff has been exonerated for the alleged misconduct that was the basis for his original placement on the CSPD and DA's Office's Brady List. The heads of these governmental agencies have subjected the City and the County to liability for their "acts directly attributed to [them] through some official action or imprimatur."[16]

---

[14] TEX. OCC. CODE § 1701.4251(e) (requires that a "law enforcement agency shall replace the original employment termination report with the changed report" upon order of the administrative law judge when the alleged misconduct is not supported by a preponderance of the evidence).
[15] *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010).
[16] *Peterson v. City of Fort Worth*, 588 F.3d, 838, 847 (5th Cir. 2009).

47.     Plaintiff has exhausted all administrative appeals and has cleared his name to the extent permitted under Texas law and yet he remains effectively blackballed from being a police officer. Plaintiff has made numerous open record and personnel records requests to CSPD and the DA's Office for the records relevant to his IA investigation and inclusion on CSPD's and DA's Office's Brady List and many of them have not been honored. Upon Plaintiff's information and belief, CSPD and the DA's Office don't even have a document—an actual physical or electronic document—that records who is on their Brady List or why that individual is on the list. Defendants CSPD and the DA's Office evidently only orally inform any law enforcement agency who inquires of a CSPD officer's Brady List status. If an actual Brady List exists, neither CSPD's or the DA's Office has produced a copy or even directly acknowledged its existence to Plaintiff.

48.     The deprivation of Plaintiff's due process rights occurs in the absence of any Texas law or regulation that would require Defendants CSPD and the DA's Office to process Plaintiff's inclusion on their Brady List pursuant to any procedural or substantive standards. This occurred, in part, because Defendants CSPD and the DA's Office are not required to report the inclusion of any individual on their Brady List to any local or state agency. It is in this vacuum that CSPD and the DA's Office are able to act without accountability. Defendant CSPD is not even in compliance with the mandates of the Texas Occupations Code that requires them to accurately report the status of an F-5 report. CSPD and the DA's Office will continue this course of conduct without judicial intervention because they are literally making it up as they go along and indiscriminately deciding which state laws, judicial findings, and legal principles they want to follow and which they do not.

49.     Plaintiff has suffered damages in excess of $1,000,000 due to Defendant CSPD's and DA's Office's conduct. Such damages include lost earnings, loss of reputation and status, loss of earning capacity, out-of-pocket expenses, and mental anguish and emotional distress.

50.     At this time, there is no entity within the state of Texas that acts as a central repository for information on Brady Listed police officers. The heads of a Texas law enforcement agencies don't have an agency that they can check with in order to determine whether a state peace officer is Brady listed and, if listed, trust that the officer is Brady listed for objectively verifiable and legitimate reasons. At best, the process of placing a police officer on a Brady List in Texas is an ad hoc process subject to the whims of the head of every law enforcement and prosecutorial agency within the state. At worst, it is a process that permits corrupt police officers to keep their badges and good ones, such as Plaintiff, to be railroaded by a process that is neither fair nor transparent. Under the current "process" for Brady listing a peace officer, there are no objective standards or procedures to guide how a peace officer can be equitably placed on a Brady List. This void has created a procedurally and substantively deficient process that has led to haphazard results. More importantly, it has damaged the administration of justice for both law enforcement officers and the public they serve.

# CLAIMS

## FIRST CAUSE OF ACTION
DAMAGES FOR VIOLATIONS OF U.S. CONSTITUTIONAL RIGHTS UNDER
28 U.S.C. § 2201

51.     Plaintiff incorporate by reference the foregoing paragraphs of this complaint as though fully set forth herein.

52.     Defendants City of College Station, Brazos County, and the State of Texas by and through their officials acting under their policies and customs, and each of them acting under the color of state law, have subjected Plaintiff to, or have caused Plaintiff to be subjected to, the deprivation of certain rights, privileges, and immunities to which Plaintiff is entitled to under the Fourteenth Amendments to the U.S. Constitution, including but not limited to:

a.  The right to substantive due process of law;

b.  The right to procedural due process of law;

c.  The right to be free from arbitrary intrusions on Plaintiff's physical and emotional well-being.

53.  As a direct and proximate cause of the acts complained herein, Plaintiff seeks a Declaratory Judgment.

## SECOND CAUSE OF ACTION
### DAMAGES FOR VIOLATIONS OF U.S. CONSTITUTIONAL RIGHTS UNDER
### 42 U.S.C. § 1983

54.  Plaintiff incorporate by reference the foregoing paragraphs of this complaint as though fully set forth herein.

55.  Defendants City of College Station, Brazos County, and the State of Texas acting under their policies and customs, and each of them acting under the color of state law, have maintained the policies and customs of designating state peace officers as Brady listed:

a.  Without notifying Plaintiff or any state peace office of such a designation;

b.  Maintaining such a designation without such a charge being substantiated in a court of law or by an adjudicatory body and, as in this case, despite contrary findings by an administrative body;

c.  Refusing to remove, delete, or correct any information in a personnel file despite a legal finding to the contrary and under state law that requires these actions;

d.  Failing to permit Plaintiff and other officers Brady listed to have access to, knowing the contents of, or inspecting any information, data, or records

contained in their personnel file, investigative report, or permitting access to any investigation or report that places a state peace office on a Brady List;

e.  Failing to implement any Constitutionally valid processes or procedures to place a peace officer on a Brady List.

56.   As a direct and proximate cause of the acts complained herein, Plaintiff has suffered general and special damages as set forth in this complaint.

# PRAYER

WHEREFORE, to redress the injuries proximately and directly caused by Defendants' conduct as stated above, and to prevent the substantial risk of irreparable injury to other Texas state peace officers as a result of the policies, customs, practices, and supervisory misconduct alleged herein, Plaintiff hereby requests the following relief:

1.  For a Declaratory Judgment removing Koym from a Brady designation;

2.  Damages in the amount to be established at trial as compensation for constitutional deprivations; past and present economic loss, emotional trauma, and loss of reputation;

3.  Damages in an amount to be established at trial for Defendants' CSPD's and DA's Office outrageous conduct pursued out of actual malice that recklessly and callously disregarded and was deliberately indifferent to Plaintiff's constitutional rights, to discourage them from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar conduct;

4.  An award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

5.  An award for reasonable and customary costs, expenses, and interest incurred in pursuit of this action; and

6.  Any additional relief the Court may deem proper.

Dated: April 5, 2023                    Respectfully submitted,

                                        MUERY & FARRELL, PC
                                        6200 La Calma Drive
                                        Suite 100
                                        Austin, Texas 78752
                                        Tel: (737) 808-0529
                                        Fax: (512) 727-6626
                                        COUNSEL FOR PLAINTIFF


                                        By: _____
                                            Manny Arambula
                                            State Bar No. 24047423
                                            Email: manny@texanlegal.com
                                            E-Service: filing@texanlegal.com